UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES : | |
| : | Docket No.: CR 08-00017-001 |
| v. : | |
| : | |
| KENNETH LONGERBEAM : | |

**MEMORANDUM IN AID OF SENTENCING**

Kenneth Longerbeam, through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing. On May 22, 2008, Mr. Longerbeam will come before this Court to be sentenced for the crime of Travel with Intent to Engage in Illicit Sexual Conduct, having previously entered a guilty plea to that offense. Based on the extraordinary confluence of circumstances that led to Mr. Longerbeam's conduct, defense counsel requests that the Court impose a sentence that falls below the applicable guidelines range. Specifically, the defense requests a sentence of twenty-four months of incarceration. Such a sentence is warranted based on the factors enumerated in 18 U.S.C. § 3553(a). This memorandum explains the causes of Mr. Longerbeam's behavior and provides the Court with a full picture of Mr. Longerbeam's character. Neither defense counsel nor Mr. Longerbeam contends that his conduct is in any way tolerable. Mr. Longerbeam has admitted to his conduct, understands that it was wrong, and accepts full responsibility. In this pleading, the defense merely seeks to provide context and completeness rather than justification or excuses.

**I.     The Facts of the Case**

On December 18, 2007, Mr. Longerbeam received a text message from a cooperating witness (CW) indicating that he was going to have sex with a 14-year-old boy. A text message conversation ensued between Mr. Longerbeam and the CW that culminated with Mr.

Longerbeam traveling from Maryland to the District of Columbia for the purpose of having sex with the CW and 14-year-old. Mr. Longerbeam had known the CW for roughly eight months prior to the evening of the offense and the two men had a sexual relationship. The CW had repeatedly expressed an interest in having sex with underage boys and Mr. Longerbeam had always dismissed the notion. On the evening that he received the text message from the CW, Mr. Longerbeam was under the influence of an extremely high dosage of a prescription stimulant that he had been abusing for some time. He was physically and emotionally drained from sleep deprivation that was associated with his abuse of prescription medication and working long hours as a police officer. Under these circumstances, he exercised terrible judgment. He took the bait and committed the offense that has brought him before the Court.

## II.    A Sentence of Twenty-Four Months is Warranted under 18 U.S.C. § 3553(a)

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that mandatory sentencing within the ranges established by the Federal Sentencing Guidelines violates the Sixth Amendment. This holding rendered the guidelines advisory. When fashioning a sentencing, the Court must now consider all of the factors enumerated in U.S.C. § 3553(a) after determining the applicable guidelines range. United States v. Gall, ____ U.S. ____, 128 S. Ct. 586 (December 10, 2007). In this case, application of those factors supports Mr. Longerbeam's request for a sentence below the applicable guidelines range. These factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to reflect the seriousness of the offense and provide just punishment for the offense. See 18 U.S.C. §3553(a). The Court must also consider the need for the sentence to afford adequate deterrence, protect the public from any future crimes, and provide the defendant with needed education, training or medical treatment in the most effective manner. The Court

must also evaluate the type of sentences available and the applicable guidelines range while seeking to avoid unwarranted disparities and provide restitution to any victims. Id. Finally, § 3553 (a) requires the Court to "impose a sentence sufficient, but not greater than necessary," to achieve Congress's sentencing purposes.

The agreed upon facts of the case are that Mr. Longerbeam, in response to communication initiated by the CW, with whom Mr. Longerbeam had a sexual relationship, traveled to the District of Columbia from Maryland to engage in sexual conduct with the cooperator and what he believed to be a 14-year-old boy. The agreement was a rouse and the boy did not exist. While this conduct cannot be excused, it is important to note that no victim exists in this case and Mr. Longerbeam did not, and has never, engaged in sexual contact with an underage person. The roles played by Mr. Longerbeam's personal battle with Post Traumatic Stress Disorder (PTSD), his abuse of a prescription Attention Deficit Disorder (ADD) medication, and the burden of his hidden sexuality are discussed below and should factor heavily into the Court's assessment of both the nature and circumstances of the offense and the history and characteristics of the defendant.

### A.     Mr. Longerbeam's Personal History and Characteristics

Mr. Longerbeam is 41 years old. He was raised in Northern Virginia by his mother, Peggy Longerbeam, and his stepfather, Joe Longerbeam. He has no prior criminal record and holds a B.A. in Psychology and an M.A. in Counseling, both from the University of Maryland. At the time of his arrest, Mr. Longerbeam was a Metropolitan Police Department officer in good standing. As noted below, Mr. Longerbeam has struggled with ADD for his entire life, and currently struggles with PTSD, as a result of two gruesome experiences associated with his work as a police officer. These struggles, combined with Mr. Longerbeam's abuse of prescription

drugs and the great pressure that he felt from keeping his homosexuality hidden from his family and coworkers, resulted in him losing control over the otherwise good judgment he had exercised until the night of his crime.

### B.     The Burden of Hidden Sexuality

Mr. Longerbeam's personal and psychological history are detailed in the attached report of Dr. Robert Madsen and discussed at length in section II(C) of this memorandum. In his report, Dr. Madsen notes and explains the significance of Mr. Longerbeam's history of PTSD, ADD, and his abuse of drugs prescribed to treat ADD. In addition to those psychological struggles, Mr. Longerbeam has spent his entire post-adolescent existence hiding his homosexuality from almost everyone in his life, most notably his family and coworkers. He chose to hide his sexuality out of fear that his family would renounce him and his colleagues would torment him. Over time, Mr. Longerbeam's secret sexual preference became a stressful burden that, in combination with his PTSD, and his misuse of prescription drugs, led to poor judgment in the sexual arena of his life. While Mr. Longerbeam has maintained some healthy gay relationships, his decision to live a covert, rather than openly, gay lifestyle placed him in the company of at least one sordid character, specifically, the cooperating witness in this case. This association allowed Mr. Longerbeam to receive the illegal proposition that has brought him before the Court. Mr. Longerbeam's decision to accept the cooperator's proposition not only cost him his career; it resulted in his incarceration and "outed" Mr. Longerbeam to his family, lifting the burden caused by his secret.

While Mr. Longerbeam stands disgraced as a result of his crime, he also feels liberated by the exposure of his homosexuality. His parents have accepted that he is gay and remain loyal to him. The fact that Mr. Longerbeam has no further need to live a secret, alternate life is critical

4

to the Court's determination of an appropriate sentence. Without question, Mr. Longerbeam's concealment of his sexuality contributed heavily to the terrible judgment that led him to violate the law. The removal of that catalyst, along with future treatment for his psychological and drug problems, all but eliminates any likelihood of recidivism.

   **C.**  **Mr. Longerbeam's Recent Psychological Evaluation**

To aid the Court in fashioning a sentence, the defense obtained a thorough psychiatric evaluation of Mr. Longerbeam. Dr. Robert Madsen conducted the evaluation. Dr. Madsen spent almost ten hours interviewing Mr. Longerbeam and administering various psychological tests. His report is attached to this memorandum. Dr. Madsen conducted five psychological tests and applied three risk assessment models designed to gauge future dangerousness. In his report, Dr. Madsen discusses at length the factors and the psychological processes that led to Mr. Longerbeam's commission of the instant offense. Among the contributing factors identified by Dr. Madsen are Mr. Longerbeam's PTSD and his misuse of prescription ADD medication.

Mr. Longerbeam's diagnosis of PTSD stems from two separate incidents that occurred in the line of duty as a Metropolitan Police Department officer in the 1990s. The first took place in 1994 when Mr. Longerbeam was attempting to arrest a PCP-crazed suspect that had killed his own mother and grandmother with a machete moments before attacking Mr. Longerbeam. The suspect was holding a sixteen-month-old child when he attacked Mr. Longerbeam. Mr. Longerbeam's partner fatally shot the suspect while Mr. Longerbeam and the suspect were engaged in a struggle. The shooting resulted in Mr. Longerbeam being covered with the suspect's blood and some of his flesh. The second root of Mr. Longerbeam's PTSD is the 1997 murder of his partner, Metropolitan Police Department Officer Brian Gibson. Following both incidents, Mr. Longerbeam suffered heavily from the symptoms of PTSD. In fact, his inability

to manage these symptoms caused him to leave the police force in 1997 and return to school. In the fall of 1997, Mr. Longerbeam sought psychological assistance and was diagnosed with PTSD and ADD. He received treatment in the form of therapy and medication.

Dr. Madsen details how the ADD medication allowed Mr. Longerbeam, who had dropped out of the tenth grade because of an inability to focus and succeed academically, to obtain a B.A. in Psychology with a 3.01 GPA, and a M.A. in Counseling with a 3.76 GPA.[1] The success that Mr. Longerbeam experienced while taking medication led him to an over-reliance on the pills that became abuse. At the time of his arrest in this case, Mr. Longerbeam had returned to the police force and was taking three to six times the recommended dosage of the prescription stimulant Adderal. This quantity of the drug eradicated Mr. Longerbeam's inhibitions and replaced his normally sound judgment with recklessness.

The facts of the case, as well as the factors noted above, combined with Dr. Madsen's evaluation and extensive testing, has led Dr. Madsen to conclude that Mr. Longerbeam poses virtually no risk of recidivism. Dr. Madsen ran the MSI-II risk assessment, the Sex Offender Risk Appraisal Guide (SORAG), and the Hare Psychopathy Checklist Revised (PCL-R) tests to determine Mr. Longerbeam's risk of recidivism. All of the testing indicates that Mr. Longerbeam is a very low risk to re-offend. According to Dr. Madsen, the MSI-II "does <u>not</u> show him to be an offender at risk for a re-offense." Madsen report at 7. (emphasis in original). The SORAG places Mr. Longerbeam in a low category of recidivism and the PCL-R shows Mr. Longerbeam to be in the "lowest possible category showing no indication of any psychopathic tendencies, just at the MSI-II showed." Dr. Madsen report at 8. All of the recidivism analyses conducted by Dr. Madsen led him to conclude "the data from testing on Mr. Longerbeam clearly and definitively show he is virtually without any realistic risk for re-offending." <u>Id.</u>

---

[1] Mr. Longerbeam obtained a G.E.D. in 1986.

Mr. Longerbeam's history and characteristics also compel a sentence below the applicable guidelines range. An analysis of the factors that contributed to his conduct, as detailed in Dr. Madsen's psychological evaluation, demonstrate that he would not have committed the instant offense but for his judgment having been compromised by his struggles with PTSD, his abuse of prescription drugs, and some of the associations caused by his hidden lifestyle. While these factors do not excuse Mr. Longerbeam's conduct, they offer some explanation and demonstrate that, while incarceration is warranted, justice is best served in this case by a treatment-heavy sentence rather than a lengthy prison term.

In fashioning sentence, the Court should also consider the fact that Mr. Longerbeam is likely to face grave danger in prison because he is a police officer. Mr. Longerbeam has arrested and testified against hundreds of people that are now inmates scattered throughout the federal prison system. Separating him from these people will be virtually impossible. Consequently, Mr. Longerbeam is likely to serve his sentence in some form of isolation. The impact of Mr. Longerbeam's status as a police officer on his prison experience is appropriate for consideration and, in this case, supports the defense's request for a twenty-four month sentence. United States v. Koon, 518 U.S. 81, 112 (1996).

### D. Deterrence, Incapacitation and Rehabilitation

The Court is required to consider the needs for deterrence and rehabilitation. Mr. Longerbeam has already been deterred. He stands disgraced by his actions and the resulting criminal conviction. He lost his career and his freedom and has brought shame to himself and his family. Five months of incarceration has also been a shocking experience for a person that never fathomed that he would find himself behind bars. Furthermore, the need for deterrence is virtually eliminated by the disclosure of Mr. Longerbeam's sexuality and can be removed in its

7

entirety if he is afforded the opportunity to have psychological and substance abuse treatment while incarcerated. Treatment combined with the jail time that Mr. Longerbeam has already served, and the prison time that lies ahead of him, is more than enough punishment to deter him from ever again committing this kind of act. For those same reasons, incarceration to incapacitate is not warranted because Mr. Longerbeam poses almost no risk to recidivate and is therefore, not a danger.

Rehabilitation is required. As Dr. Madsen notes, Mr. Longerbeam must receive substance abuse treatment as well as treatment for ADD and PTSD. Treatment should begin while he is incarcerated and continue for as long as necessary thereafter. Because Mr. Longerbeam can begin, and even complete, significant treatment for all of these issues if the Court imposes the sentence requested by the defense, and because he can safely continue this treatment after his release, the need for rehabilitation should not motivate the Court to sentence Mr. Longerbeam to any more incarceration than the requested twenty-four months.

### E. Mr. Longerbeam's Guidelines Calculation

Mr. Longerbeam's base offense level for the offense of Travel with Intent to Engage in Illicit Sexual Conduct is 24. See U.S.S.G. §2(G)1.3(a)(4). Three points should be deducted for acceptance of responsibility, which reduces the offense level to 21. See U.S.S.G. § 3E1.1. The government argues that a two-level enhancement for use of a computer is applicable based on Mr. Longerbeam's use of his telephone. *See* Presentence Report at 4; U.S.S.G. § 2G1.3(b)(3)(B). The defense objects to the two-level enhancement. An application of the guidelines and cases demonstrates this enhancement to be inapplicable. First, the Application Notes to U.S.S.G. § 2G1.3(b)(3)(B) indicate that the use of a computer enhancement "is intended to apply only to the use of a computer or an interactive computer service to communicate directly

with a minor or with a person who exercises custody, care, or supervisory control of the minor." U.S.S.G. § 2G1.3(b)(3)(B) cmt. 4 (emphasis added). Mr. Longerbeam did not use his telephone to communicate with any such person. In fact, nothing that was communicated by the CW to Mr. Longerbeam signaled that he had "custody, care, or supervisory control of the minor." The communications indicated only that the boy was present. The government begins its argument that the enhancement applies by citing three cases that do not address the issue. United States v. Hornaday, 392 F.23d 1306 (11th Cir. 2004); United States v. Murrell, 368 F.3d 1283 (11th Cir. 2004); and United States v. Saucedo, 2007 WL 3124658 (Oct. 25, 2007), interpret a statute governing inducement of a minor, where the cooperator had clear custody or control over the purported minor, and do not address the applicability of the use of a computer enhancement to circumstances similar to those present in Mr. Longerbeam's case. Indeed, the government cites no case that stands for the proposition that the use of a computer enhancement applies to the circumstances present in this case.

The government also cites United States v. Vance, 494 F.3d 985 (11th Cir. 2007). This case is factually distinguishable as the defendant in Vance received clear information indicating that the man with whom the defendant believed he was communicating had "custody, care, or supervisory control of the minors." The Court noted that the undercover officer "offer[ed]" a variety of" underage girls that he would "line up" for Mr. Vance. Id. at 997. The Court interpreted this communication to signal to Vance that the purveyor of the young girls had the requisite authority over them to trigger the use of a computer enhancement. See id. In the instant case, Mr. Longerbeam did not receive any communication that included such a clear statement of authority over the fictional boy.

9

The statutory definition of the term computer also reveals the use of a computer enhancement to be inapplicable. Application Note 1 to U.S.S.G. § 2G1.3(b)(3)(B) adopts the definition of computer contained in 18 U.S.C. § 1030(e)(1). Computer is defined as an "electronic, magnetic, optical, electrochemical, or other high speed date processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to operating in conjunction with such a device…" This provision, which is part of a statute that addresses computer fraud, clearly does not include a telephone. Because a telephone is not a computer for purposes of the use of a computer enhancement, the enhancement is inapplicable. The final base offense level in this case is therefore 21, exposing Mr. Longerbeam to 37-46 months of incarceration under the Federal Sentencing Guidelines.

### III.     Conclusion: Mr. Longerbeam's Requested Sentence

Counsel for Mr. Longerbeam, for the reasons stated in this memorandum, respectfully submits that Mr. Longerbeam's guideline range is 37 to 46 months of incarceration, but contends that this sentencing range is greater than necessary to achieve the sentencing purposes of § 3553(a), and requests that Mr. Longerbeam be sentenced to a term of not more than 24 months of incarceration. Mr. Longerbeam requests that the Court recommend that he receive drug treatment while incarcerated.

Dated: May 20, 2008                               Respectfully submitted,

                                                                   /s/
                                            Danny Onorato (DC Bar No. 480 043)
                                            On Behalf of Mr. Kenneth Longerbeam
                                            Schertler & Onorato, L.L.P.
                                            601 Pennsylvania Ave., N.W.
                                            North Building, Ninth Floor
                                            Washington, D.C. 20004
                                            Telephone: (202) 628-4199

# ATTACHMENT 1

**Voice**
**(202) 686-2202**

**FAX**
**(202) 686-2208**

**ROBERT K. MADSEN, PH.D.**
**Suite 303**
**5028 Wisconsin Ave. NW**
**Washington, DC 20016-4119**

May 16, 2008

Mr. Danny Onorato
Schertler & Onorato LLP
601 Pennsylvania Ave., NW
North Building, 9th Floor
Washington, D.C.  20004-2601

Re: U.S. v. Kenneth Longerbeam
Cr. No. 08-017

Dear Mr. Onorato:

At your behest on May 1st I initiated a private pre-sentence evaluation of your client, Mr. Kenneth Longerbeam, a forty year old former veteran Metropolitan Policeman of approximately twelve years service who awaits sentencing in the United States District Court for the District of Columbia on a one count charge of **Travel with Intent to Engage in Illicit Sexual Conduct**, in violation of Title 18, United States Code, Section 2423(b).  Charging documents and discovery material indicate he was apprehended on December 18, 2007 in a sting operation conducted by the FBI when he attempted a personal meeting for sexual purposes with an underage male.  You asked for an evaluation into his character and propensities and I was to report back to you by mid-May as to my findings and recommendations.  The paragraphs below relate my impressions and beliefs as promised.

PROCEDURES EMPLOYED

To date Mr. Longerbeam and I have met on three occasions, totaling approximately nine and one-half hours of direct contact.  In the first session I took a brief psychosocial history and I performed an abbreviated mental status examination.  I also had him take three brief psychological tests.  During the next session I had him take two more lengthy instruments, the last of which is a sophisticated survey assessing sexual matters.  He thus completed five standard psychological tests in all.[1]

---

[1] The first instrument employed was a brief measure of intelligence and a screening measure for organicity called the Shipley Institute of Living Scale, Revised (SILS).  A second screening test was employed to assess personality style; it is called the Eysenck Personality Questionnaire, Revised

Psychological Presentence Evaluation
Kenneth Longerbeam

In a final session, I discussed with Mr. Longerbeam the complete findings from these five tests. During that session, I also explored with him a number of facets of his personality therein revealed, be they positive or negative. At that time I also completed two ratings that assess from different outlooks the likelihood of his acting out against minors. The first is an actuarial procedure designed to predict from static (historical data) the probability of him committing a sexual offense once he is released (recidivism). That measure is called the Sex Offender Risk Appraisal Guide (SORAG) and it complements the MSI-II noted above that provides some predictive data on the potential for further offense based upon some static as well as personality related variables (dynamic factors). To finish this last procedure I also had to fill out the Hare Psychopathy Checklist, Revised (PCL-R) which is another assessment (beyond that included in the MSI-II) of his dynamic personality and the inclusion of any psychopathic markers. The following brief paragraphs relate the more salient findings of my contacts with him, including the data obtained from interviews and testing. My conclusions follow.

**IMPORTANT INTERVIEW FINDINGS**

Since Mr. Longerbeam's Presentence Report contains a fairly thorough and accurate account of much of his background information I will not repeat that material here. Rather, I want to emphasize a few of the more psychologically important aspects that provide a psychologist with information that is known to be of particular import in the development of attitudes and behavior. I trust this will aid the Court in understanding Mr. Longerbeam better and fashioning a sentence deemed appropriate, taking into account the many competing issues required.

Though Mr. Longerbeam was born into an intact family unit, the divorce of his parents, when he was an infant, left him yearning for a greater degree of "connectedness," particularly to a father (male) figure. This longing has continued throughout his life, even after his mother remarried his stepfather, Mr. Joseph Longerbeam, when young Kenneth was five and he developed a positive relationship with his stepfather thereafter. It seemed to me in our interviews, however, that Mr. Longerbeam was imprinted in those first years of life with a greater need than most for validation as an important someone to others, particularly men. He said quite revealingly at one juncture, "I was looking for something that I couldn't have, and I didn't know how to get it – emotional connection."

---

(EPQ-R). A third test given was a measure assessing "normal" personality functioning; it is called the Sixteen Personality Factor Test, Fifth Edition (16PF). A fourth instrument was a test assessing "abnormal" personality functioning called the Millon Clinical Multiaxial Inventory, Third Edition (MCMI-III). This last instrument utilized is a test designed to assess one's sexual knowledge, sexual attitudes and similarity to groups of known sex offenders, such as child molesters and rapists. That instrument, the Multiphasic Sex Inventory, Revised (MSI-II) was the only measure not scored in my office. It had to be sent to a national clearinghouse for scoring; it was returned to me yesterday.

Psychological Presentence Evaluation
Kenneth Longerbeam

Another important factor of note relates to Mr. Longerbeam's diagnosed Attention Deficit Disorder (ADD). This official diagnosis was given him in the third grade and he noted, "I was really smart, but I couldn't stay focused." He traversed the usual road such children trod by passing through the early grades with decent grades, but then they cannot maintain adequate study skills as the material and its complexity expands. Accordingly, Mr. Longerbeam repeated the sixth grade, despite a rather keen intellect, and he commented that it was "torture" to be in school from the sixth through the tenth grades, when he just dropped out. He noted that stimulant medicines and a few other treatments, like vitamin B-12 supplements, were tried briefly during his formative years, but nothing seemed to stick. Accordingly, although he was able to get his GED diploma from an Arlington County Adult Education program in 1986, Mr. Longerbeam suffered through the untreated signs and symptoms of his ADD condition for years. This includes not only those issues related to academic matters, but also the adverse social aspects of the diagnosis which usually involve a degree of ostracism by peers and oft repeated criticisms by most everyone in the child's universe. Of course, this also did not lead to feeling emotionally connected.

In the fall of 1997, however, when Mr. Longerbeam had left his first stint of MPD police work for classes at the University of Maryland, he was given a dual diagnosis of Post-traumatic Stress Disorder (PTSD) and ADD. [I will address the PTSD issue later.] Along with these diagnoses, Mr. Longerbeam was prescribed the antidepressant, Prozac, and the stimulant, Ritalin. [These were later changed to the antidepressant, Zoloft, a "cousin" of Prozac, and the stimulant, Adderal ER, for extended release.] Having his core dysphoria and impulsivity treated by the antidepressant(s), and his inability to focus attenuated by the stimulant(s), at last he felt whole. It is predictable, therefore, that he would do well, as he did, graduating with a BA in psychology in 1999 with a GPA of 3.01, and completing the coursework for an MA in counseling in 2003 with a GPA of 3.76. Indeed, it seemed to me in reviewing his adjustments over time (to work, to social encounters, etc) that Mr. Longerbeam's best performance always correlated with his consistent adherence to taking the prescribed dose(s) of these two medicines.

Regarding the PTSD diagnosis noted earlier, Mr. Longerbeam was greatly unnerved by the gruesome deaths he witnessed in 1994. In detail he related how a suspect had killed his mother and grandmother with a machete and then accosted him and his partner with a sixteen month baby in arms. Being high on PCP the struggle went on for some time as the man seemed impervious to pain. The culminating horror came when his partner shot the man several times, spewing blood and fleshy body parts over Mr. Longerbeam. This led to all of the classic signs/symptoms of PTSD, including recurrent and intrusive recollections of the distressing event, night terrors, flashbacks, and heightened psychological distress and heightened physiological reactivity upon exposure to internal or external cues that symbolize or resemble an aspect of the trauma. Along with persistent symptoms of increased arousal, e.g. hyper vigilance, difficulty concentrating and sleep disturbance, he also had the persistent avoidance of stimuli associated with

Psychological Presence Evaluation
Kenneth Longerbeam

the trauma, e.g. avoidance of anything that would remind him of the chaotic scene involved, such as thoughts, feelings, people and places. Most importantly, however, he developed the uniquely PTSD symptoms of psychological numbing of responsiveness, e.g. feelings of detachment or estrangement from others, having a restricted range of affect, and a sense of a foreshortened future.

Needless to say, these mental and emotional difficulties separated him further from others. They persisted and required the above noted medication regimen with an antidepressant, but remember that did not start until his entry into college three years later (1997). He did receive some preliminary therapy at the time, but it clearly was not enough as the symptoms waxed and waned in a persistent manner during those years. He would have been somewhat OK with this incomplete, yet beneficial therapeutic intervention, but for another event that occurred that was more personally painful to bear. In February 1997 his partner was blatantly killed, execution fashion, by a bullet to the head as he sat unexpectedly in his police cruiser outside the old Ibex Club at the corner of Missouri and Georgia Avenues. Though Mr. Longerbeam had just gone off shift and was at home at the time, this triggered all of the old PTSD issues, complicating his life all around. All of this caused him to leave a job he had enjoyed as he was unable to shake off the symptoms noted and just wanted to escape. Though going to college for the next six years was a positive life course, especially since he received the beneficial effects of his antidepressants and stimulants as a result of his association with a course of study in psychology, Mr. Longerbeam in many aspects was perpetuating his avoidant stance with others during this period. He also was becoming enmeshed in "thrill seeking" behavior that would distance him form a dysphoric affect much like an addict avoids such with drugs or alcohol.

Another down side of his newfound treatments was that it became clear to him that the stimulants were <u>very</u> beneficial to his overall success in school. For the first time he found that he could focus well and with duration while under their influence. While this is good, as his grades show rather well, given his abject academic difficulties through the tenth grade, it also taught him a negative lesson. Like so many who find something good and then take it to excess, Mr. Longerbeam over-utilized his medication privilege by taking up to five or six tablets/day instead of the one or two recommended. As such, the medication seems to have crossed over through the therapeutic range and into an abusive habit that would let him speed through the day. Under this excessive dosage, it would not help him to focus better. Rather, in this excessive dose it led to an increase in ill-advised behavior. He explained it this way to me. His medicine would allow him to focus so intently upon something that he could not get that something out of his mind. When sexually aroused, for example, he would single-mindedly pursue sexual satisfaction to the exclusion of any other more prudent course of action. Simply put, he could not get anything else into his head until the press of the point at hand was discharged.

Psychological Presentence Evaluation
Kenneth Longerbeam

Finally it needs to be mentioned that Mr. Longerbeam developed a rather disjointed sex life beginning before puberty and extending into the present. That is to say, his first sexual contacts around age twelve were rather innocuous ones, but they led inexorably at age fourteen into repeatedly overt orgasmic encounters with other boys. It is notable to me that he inadvertently mentioned these involved "cuddling" and "emotional connection" along with the sexual release. At age eighteen, however, he began a series of sexual liaisons with age appropriate women. He noted he had sexual desires and engaged in sexual behavior with four or five female partners. At this time he was exclusively heterosexual until he was twenty four; he had his last female contact when he was twenty-seven or twenty-eight. During that transition period of twenty-four to twenty-seven or so, when he went back to exclusive encounters with men, Mr. Longerbeam clearly showed he could be engaged with either sex. Although he is exclusively homosexual in orientation and behavior now, I believe he is truly bisexual. The fact he had told "only a select few" about his homosexual orientation is understandable, therefore, not only because of his association with many macho men, but also because he, himself, has not been all that clear with himself about whom he is and what he has wanted. This is not to say he is now uncomfortably Gay; he is not. Rather, the point is that his sexual development has been disjointed and muddied by a number of things, one of which is the aforementioned need for "emotional connection" that I think may well relate to those early years of deprivation from male attention.

Regarding the instant offense, Mr. Longerbeam was still in obvious dismay with regard to what has transpired. To his credit he did not try to dodge in any way what he is reported to have done. He showed obvious guilt, shame and remorse in both word and demeanor. The most important part of this, however, was that he was angry at himself for being so foolish. He clearly disavowed any *a priori* interest in engaging a teen for sex. In explaining how he became involved in this sordid issue he spoke in a detailed fashion about how he met his Internet friend, Edward, who, over a period of about eight months, engaged Mr. Longerbeam in several sexual encounters, usually a threesome with another adult male. Edward, however, persistently talked about having had sex with underage boys and propositioned Mr. Longerbeam about doing such. Mr. Longerbeam noted that the age range spoken about over time got younger and younger. He said, however, that though he adamantly declined all entreaties from Edward to indulge in this behavior, Mr. Longerbeam <u>was</u> curious about such. Nevertheless, Mr. Longerbeam noted that he had last spoken to Edward roughly six weeks prior to the fateful text messages on December 18, 2007 when Edward purportedly was soliciting him. When asked why he had "bought into" the proposal of having sex with a fourteen year old at that time, when he adamantly (and disgustedly) had refused prior entreaties for sex with even younger boys before, Mr. Longerbeam commented that the earlier offers registered with him as being <u>very</u> young while this one leading to his arrest and plea "seemed to be older." Obviously this was a skewed perception motivated by something within.

Page 5

Psychological Presence Evaluation
Kenneth Longerbeam

Under questioning about external and internal issues concomitant with his ultimate assent to engage in underage sex, though he had refused it on a number of other occasions, Mr. Longerbeam noted that he had been without sex for a time, that he was physically and emotionally spent, that he had taken multiple doses of his stimulant during the half day before the assent, and that he was hyper-focused upon sex. He also noted that he was confused and upset about a number of things going on in his life, such that he was just dumbly preoccupied with whatever he became interest in – in this case the satisfaction of a sexual need. These factors place him squarely into a grouping of offenders that are not predators, but rather opportunistic responders to a confluence of contributing factors, that unfortunately align at an inopportune time.

While none of Mr. Longerbeam's history and presentation to me indicated any significant material suggestive of a mental disorder, it did suggest the type of background often seen in those who are socially and emotionally immature, hence vulnerable to doing things that are ill advised. An early criminologist first noted in the 1950's that those arrested for various offenses come from four basic groups. The first, and perhaps the largest, comprises the psychopaths who care little for another's rights, let alone feelings. The second, another large group, are the so-called sub-cultural criminals who do what they do because that is the only way they see as a possible course to survive; crime for them is just a way of life. A third group, very small in numbers, comprises those who commit offenses due to mental illnesses. Finally, the fourth category, rather small in numbers, deals with those who are naïve and immature; these commit offenses out of ignorance and ineptitude, often falling into things in spite of themselves. Mr. Longerbeam seems to be from this latter group, and testing data strongly corroborated this conceptualization.

**IMPORTANT TESTING DATA**

On the SILS Mr. Longerbeam produced a Verbal raw score within the average range (approximate 60%) but an Abstraction score considerably higher (approximate 90%). These suggest that he is rather bright (Combined score at the 80% level) and <u>not</u> beset with any obvious organic brain dysfunction since his abstraction score equals or exceeds his verbal score. It is estimated that his IQ would be somewhere around 110-115 (75th to 85th percentile).

On the test of personality style (EPQ-R) Mr. Longerbeam produced a valid protocol that suggests he is an individual who is clearly introverted (Extraversion @ 5th percentile) but more emotionally stable than not (Neuroticism @ 8th percentile). These are the two major (far and away most important) personality variables. They are much more inclusive of contributing factors than the simple terms of Extraversion - Introversion and Emotionally Stable - Emotionally Unstable suggest. Suffice it to say here that those who are introverted and/or unstable experience much more dysphoric affect, problematic behavior, and dysfunctional cognition than those who are extraverted and /or emotionally stable. When one is both

introverted <u>and</u> emotionally unstable he/she is particularly susceptible to psychiatric problems. Mr. Longerbeam's scores put him squarely within one of the two lesser serious 2X2 quadrants (Phlegmatic Category). This category is known to predict those who <u>do</u> <u>not</u> often develop mental or emotional difficulties, though they are more likely to do so than those who are extraverted and emotionally stable (Sanguine Category). Hence, Mr. Longerbeam is not particularly at risk of serious mental, emotional, or behavioral difficulties.

Mr. Longerbeam's summary factor scores from the 16PF corroborated his accurate placement in this quadrant as he showed in a somewhat defensive test protocol that he is an introvert (Extraversion @ 23rd percentile), but an emotionally stable one (Summary Anxiety @ 1st percentile). Moreover, his summary Tough Poise score was very high (96th percentile) suggesting he tends to be more cognitive and deliberate under pressure than most. Additionally, his scores on the first-order factors suggested more stability than not with particularly positive scores suggesting high Ego Strength (89th percentile), average Superego, and average Compulsivity. These are the so-called brakes required to modulate impulsive behavior. There were, however, strong suggestions of a degree of social/emotional naiveté. For example, he tested low to very low on dimensions of Surgency (F-3), Suspiciousness (L-3), Imagination (M-3) and Rebelliousness (Q1-2). These suggest he is rather inhibited around others and far more trusting (naïve) than not. They also suggest that he is lacking in guile and that he is very "traditional" in his outlook on life. The low Imagination score in particular suggests he can get something on his mind and follow it strongly. Factors that produced Low Guilt-proneness (O-2), low Sensitivity (I-3), and low average Warmth round out a picture of someone who is more self-assured than not, but generally utilitarian in approach and cool towards others.

The test of so called "abnormal" personality functioning revealed a lingering diagnosable mental health issue. The specific scale assessing PTSD was elevated into the clinically significant range. This suggests an unresolved problem in this area, as suspected in the interviews. There was also a mildly heightened score on a scale of undue anxiety. This is probably reflective of some situational anxiety over his status before the Court. There were <u>no</u> indications of any Axis II problems, however, as the three scales mostly identified with "normalcy" were all appropriately up and none of the negative areas were highlighted, such as for either an Antisocial or a Sadistic Personality Disorder. It is instructive, therefore, to look carefully at the type of offense committed and the sexual backdrop upon which these behaviors occurred. The MSI-II did just that.

On the MSI-II Mr. Longerbeam produced a defensive test that masked and suppressed his test results to some degree. Even so, there are certain scores of note that auger well for his adjustment. For example, he indicated that he has always known it is wrong to either force someone to have sex or to engage a minor in sex. He also did not endorse items suggesting he is sociopathic or beset with a behavioral disorder. Furthermore, he only endorsed 5 of a possible 49 items

suggestive of any denial and/or justification for his misbehavior. Moreover, on a Problematic History Index he produced a low score of 5 when a score of 16 or more suggests a man who has a significant history of negative life experiences, behavioral problems and legal difficulties. A high "static" summary score, on the other hand, usually accompanies those who have engaged in illegal conduct and those who will likely repeat such. Thus the MSI-II does not show him to be an offender at risk for a re-offense. The Sex Offender Risk Appraisal Guide (SORAG), like the MSI-II scales noted above, also verified that behavioral expression of any deviance is not likely.[2]

The SORAG is a static measure of one's propensity to re-offend once one is released into the community from confinement after having committed a sex offense. Even using the most stringent criteria possible on Mr. Longerbeam's data set, he still only emerges in the next to lowest category with a 15% chance of sexually offending within 7 years and a 12% chance within 10 years of release. This is very much in line with the MSI-II's indication that he does not show any real propensity on static variables of offending further. Moreover, it should be added that in order to perform a SORAG evaluation one also needs to run an individual through the criteria of the Hare Psychopathy Checklist, Revised (PCL-R). On that measure Mr. Longerbeam emerges in the lowest possible category, thereby showing no indication of any psychopathic tendencies, just as the MSI-II also showed. Hence, the data from testing on Mr. Longerbeam clearly and definitively show he is virtually without any realistic risk for re-offending.

**ANALYSIS & SUMMARY**

The composite of the data obtained from testing and interviews suggests that Mr. Longerbeam developed an emotional neediness very early in life. It appears that this contributed to his bisexual development where he initially sought out emotional satisfaction through homosexual encounters with boys of his same age. This set up a precedent for sexual contact with a certain type of partner, i.e. young male, as he found these encounters pleasant sexually and emotionally. Complicating his life throughout his youth and into his adult years has been his ADD symptoms and their on-again, off-again treatment. His PTSD problems are just as significant and equally complicating of his better functioning. Perhaps of greatest import to the current offense, however, was his fortuitous, yet perilous placement on antidepressants and stimulants that addressed these issues so well. Simply put, he learned to take more and more of the stimulant in order to maintain a sense of focused competence. In the end he became addicted to his stimulant. His offense,

---

[2] A more complete description of this instrument than given above is that it was developed in Ontario, Canada from a decade's long study with a population of mentally disordered offenders, sex offenders, fire setters, and psychopathic offenders. Using mostly demographic data collected from such individuals, the authors constructed risk appraisal guides predictive of future violent and/or sexual offenses. The SORAG produces nine categories of predictive risk depending upon the score one achieves. The re-offense probabilities for those nine categories range from .07 to 1.0 (7% to 100%) within two periods, one a seven-year range after release and the other a ten-year period post release from confinement.

therefore, was a product of a number of factors, all of which led to a clear moment of naïve and ill-advised surrender to a baser instinct.

It cannot be said too strongly, however, that Mr. Longerbeam does not appear to be the type of predatory villain that the government's sting operation was primarily designed to ensnare. Rather, he seems to be the klutz that stumbled into doing something that he has some interest in, but would, under most all circumstance, rarely, if ever, do. His lack of <u>any</u> real psychopathic or paraphillic background says much good about him, as does the fact that two sets of static variables do <u>not</u> suggest he is at any real appreciable risk of re-offense. Moreover, to his credit, obviously contributed to by the instant offense and the consequences laced therein, Mr. Longerbeam has recoiled at his poor judgment. His avowed intention to stay clear of any recurrence only bolsters the static data that suggests he would not likely repeat in any case.

With the above in mind, I do not believe that Mr. Longerbeam would benefit from any incarceration, if the purpose for such were to provide to him any additional incentive to avoid behaviors such as those that led to his arrest. The probability of him re-offending is too low in the first place for there to be any appreciable decrease achieved by such a method. I can say on the other hand, however, that his nearly five-month stint in jail has led him into considerable introspection. He wants that to continue and he looks forward to therapy/counseling that can further his recovery from his PTSD symptoms. He will need continued medication to deal with his ADD symptoms as well, but that cannot occur until he gets treatment for his abuse of stimulant medications. All of this, of course, will take considerable time and effort. I believe he is up to the task; I hope he is given the opportunity to do it.

Balancing all of the competing variables here involves justice in the fullest context of what that term means. I trust that these presents aid in the Court's determination of such.

Please feel free to contact me for any clarification of the above.

Sincerely,

_____/s/_____
Robert K. Madsen, Ph.D.